The UNITED STATES for the Use of H. T. SWEENEY & SON, INC., Plaintiff,

v.

E.J.T. CONSTRUCTION CO., INC., et al., Defendants.

Civ. A. No. 4734.

United States District Court,
D. Delaware.

June 25, 1976.

Julian D. Winslow, Wilmington, Del., Arthur E. Ballen, Camden, N. J., for plaintiff.

George F. Gardner, III, of Schmittinger & Rodriguez, Dover, Del., for defendants.

## OPINION

STAPLETON, District Judge:

This is an action brought pursuant to the Miller Act, 40 U.S.C. § 270a, *et seq.*, involving claims arising out of a warehouse construction project at the Dover Air Force Base in Delaware.[1] Plaintiff, H. T. Sweeney & Son, Inc. [hereinafter "Sweeney"], who subcontracted to do the excavating and related work, seeks recovery of amounts alleged to be owing and unpaid by the general contractor, E.J.T. Construction Company ["E.J.T."].[2] The defendants are the general contractor and its sureties. Presently before the Court is the defendants' motion to dismiss the action on limitations grounds,[3] pursuant to 40 U.S.C. § 270b(b) which states:

Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any District in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in con-

---

1. Complaint, Doc. No. 1.

2. *Id.*

3. Doc. No. 8, ¶ 14(a). The parties are agreed, because of their reliance herein on materials beyond the pleadings, that this motion must be treated as one for summary judgment. F.C. R.P. Rule 12(c).

troversy in such suit, but no such suit shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by him. . . .

This suit was filed on September 28, 1973. Plaintiff, in resisting defendants' motion, asserts that both itself and one of its subcontractors, the Del-Grass Company ["Del-Grass"], "performed labor" and/or "supplied material" subsequent to September 28, 1972. Each of these bases for resisting defendants' motion shall be examined in turn.

## I. THE OCTOBER 6, 1972 WORK OF DEL–GRASS.

### A. *Del-Grass's Status As A Sub-subcontractor.*

In abbreviated form, the limitations provision cited above states that:

> Every suit . . . shall be brought . . . for the use of the *person suing* . . . but no such suit shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material supplied *by him.* . . .[4]

Defendants argue that the word "him" "plainly refers back to the person suing, in this case, Sweeney. . . ." They thus argue that plaintiff cannot rely on the work of its subcontractor without regard to character or timing of that work. Defendants assert that "[a contrary interpretation] is contrary to the plain working of the statute. . . ." Moreover, they claim that the legislative history of the limitations provision evidences a Congressional intent to bring an element of certainty to the litigation process respecting Miller Act claims, and that plaintiff's interpretation would undermine this Congressional objective.

I find defendants' argument unpersuasive. While a literal reading of the statute supports defendants' interpretation, its text must be read as a whole to provide a reasoned scheme for dealing with the problems which Congress was addressing. Moreover, so far as the legislative history is concerned, I find that the result urged by defendants is not a necessary one and, indeed, that the legislative history suggests a contrary one.

First, from a practical standpoint, defendants' counsel conceded at oral argument that it is not unusual for a subcontractor to in turn subcontract all of the work he commits to perform. In such a case, if defendants' literalistic interpretation of the limitations provision were followed, that provision would be incapable of application. This difficulty with defendants' suggested interpretation is further highlighted when one examines the provision of the Miller Act establishing the right to sue itself. The relevant section provides:

> Every person who has furnished labor or material . . . and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue . . . .[5]

If defendants' interpretation of the essentially identical language in the limitations provision were transposed to this statutory section, subcontractors would have no right to sue for payments respecting work performed by their subcontractors.

Turning to the legislative history of the Miller Act, it shows that, prior to 1959, the limitations period ran from the "date of final settlement of [the principal] contract. . . ." The determination of the "date of final settlement" was charged to the Comptroller General of the United States. On February 24, 1959, the Comptroller General forwarded to the Congress a proposed amendment to the Miller Act and wrote to the Speaker of the House in support thereof that "[while] employment of the 'date of final settlement' as the starting point for the one-year limitation probably was not expected to create any great administrative burden, certain factors have operated to

---

4. Emphasis added.

5. 40 U.S.C. § 270b(a).

give increased importance to the limitation in the case of laborers and materialmen relying upon payment bonds, and, correspondingly, our work in determining and certifying such data has multiplied. . . ." [6] Furthermore, the Comptroller General noted, the "date of final settlement" provision served no particular purpose and, worse, because of the esoteric nature of the determination—necessarily made *ex post facto*—many contractors would be confused about when their rights to sue expired in a given case. A prime virtue of the proposed amendment was, then, that it "would eliminate all responsibility of the Government for fixing the date at which the period of limitation commences to run. . . . " [7] Incorporating the Comptroller General's letter in its report, the House Committee on the Judiciary reported the bill out stating as follows:

The Committee feels that the proposed legislation is most meritorious. It will not only result in savings in administrative costs to the agency but it will also provide for those entitled to sue under payment bond requirements of the Miller Act, a simple, fixed and certain method for determining the period within which the suit must be filed. . . . [8]

Given this background, I agree with the defendants' view that "certainty" was an objective which Congress sought to promote by the Miller Act limitations amendment. I don't see, however, that this fact militates in favor of defendants' literal approach to the interpretation of that provision. It appears to me that the certainty which was sought is achieved as long as the event which sets the statute running is not something which has to be later determined by a third party according to criteria not generally familiar. In this context, I find no difference between making that event the last "work day" of the sub or the last "work day" of his last-to-finish sub-subcontractor. Either occurrence is equally cognizable by the parties.

Moreover, I find plaintiff's interpretation more consistent with one of the other aims of Congress in enacting the limitations amendment. In his letter to the House Speaker, the Comptroller General stated:

Actually, 'final settlement' (plus six months) served the purpose under the Heard Act of fixing the accrual date for enforcement action, but, with substitution of a different accrual date under the Miller Act, a single date is inequitable in that some claimants (those performing first) have a longer time within which to sue than others (those performing later). In the case of a large construction contract, this might mean years. To operate equitably upon all claimants, and to insure that there will be no extended delays in asserting the right provided in any instance, it appears that individual limitations of the same length should be made applicable to each. . . . [9]

In reporting out the bill, the House Judiciary Committee stated:

The change in the law recommended by the Comptroller General will place every laborer or supplier of materials on an equal basis. Those supplying labor or material in the first stage of the contract will be subject to the same one-year period within which to institute suit as those performing labor or supplying materials in the last stages of the contract. . . . [10]

Given this Congressional concern about making the limitations period an even-handed affair, an interpretation of the limitations provision which would create inequality among classes of subcontractors should be avoided. The interpretation suggested by defendants, however, creates, at least in certain instances, two unequal classes—namely, subcontractors not employing sub-subcontractors and those so em-

---

**6.** 1959 U.S.C.C. & A.N., Vol. 2, at p. 1997.

**7.** *Id.* at 1999.

**8.** *Id.* at 1996.

**9.** *Id.* at 1999.

**10.** *Id.* at 1996.

ploying. For example, should a subcontractor who employs no sub-subcontractors not be promptly paid at the conclusion of *his* phase of the construction project, he will have a year from the date of that conclusion in which to take his claim to court. However, if the same subcontractor employs a sub-subcontractor to do a job which happens to constitute the last portion of the sub's phase of the construction project, and if the prime contractor defaults in payment for this last part of the job, the subcontractor's period for bringing suit will be foreshortened by the amount of time between his completion date and that of his sub-subcontractor. Indeed, in the extreme case, the limitations period could even run before the right to sue accrued!

Accordingly, I believe the most reasonable interpretation of the limitations provision permits a subcontractor to rely on work done by his subcontractor in computing the limitations period.

### B. *The Nature Of The Del-Grass Work.*

The defendants assert that the work done by Del-Grass on October 6, 1972 was in the nature of repairs. All of the record evidence supports this view. First, Mr. Opdyke, Del-Grass' proprietor, testified at his deposition that the work done on October 6, 1972, was "reseeding work in some areas where the grass wasn't thick enough . . ."[11] or, possibly, the seeding of some areas which had previously been overlooked.[12] Second, a transmittal letter of March 19, 1973, accompanying a Del-Grass invoice for its part of the Dover Air Force Base job states:

I am conceding that there was some question last Fall as to the acceptability of some small areas. These areas were reseeded with a Rogers Over-Seeder at the rate of four pounds per thousand square feet, which is more than is normally used

to cure deficient areas. This work was done on October 6, 1972.[13]

These statements are corroborated by the fact that the last Del-Grass payroll on the Dover AFB job was on August 8, 1972,[14] and the fact that Del-Grass originally billed plaintiff for the Dover AFB job on September 8, 1972.[15]

Plaintiff has introduced no competent evidence to contradict that of the defendants and I, accordingly, conclude there is no material dispute regarding the nature of the Del-Grass work on October 6, 1972.[16] The work on that date was not done in performance of the original contract obligations, but was work done to correct deficiencies in the work as originally performed.

Defendants urge that the foregoing conclusions render this a clear case in their favor. They note that the cases which have treated the "repairs" question—either in the context of construing the limitations provision here in question, or in construing an older, but comparably-worded Miller Act notice provision—have ruled, almost without exception, that repair work does not constitute the "performance of labor" or "supplying of materials" under the Miller Act. See *United States for the Use of State Electric Supply Co. v. Hesselden Construction Company,* 404 F.2d 774 (10th Cir. 1968); *United States for the Use of Austin v. Western Electric Co.,* 337 F.2d 568 (9th Cir. 1964); *United States for the Use of Laboratory Furniture Co. v. Reliance Insurance Company,* 274 F.Supp. 377 (D.Mass. 1967); *United States for the Use of John T. Evanick & Company v. Merritt-Chapman & Scott Corporation,* 185 F.Supp. 587 (M.D.Pa. 1960).

The position urged by defendants is supported by practical considerations as well as the great weight of authority, and I adopt it.

---

11. Deposition of Milton R. Opdyke, Doc. No. 32, at 18.

12. *Id.* at 19.

13. Exhibit to Opdyke Deposition.

14. See Defendants' Exhibits 3 and 4 to Deposition of Opdyke, Doc. No. 32.

15. *Id.,* Exh. 6.

16. *Janek v. Celebrezze,* 336 F.2d 828, 834 (3rd Cir. 1964).

In situations which the Miller Act governs, prime contractors undertake to perform certain work and incur obligations to subcontractors in conjunction with that performance. In order to encourage subcontractors to participate in the construction projects, the prime contractors are required by law to furnish a payment bond. In the course of a construction project governed by the Miller Act, therefore, substantial amounts of money (both of prime contractors and its sureties) become encumbered. Given this situation, there are obvious benefits to be derived from creating a point in time at which assets can be distributed with a full knowledge of liability and after which both a debtor and a surety may have a secure repose.[17] The Miller Act limitations provision here in question functions to create just such a point in time.[18]

It is to be noted that this function of freeing assets and providing repose is enhanced in direct proportion to the certainty of the debtor and sureties respecting the occurrence of the relevant date. Although Congress, in enacting the provision here in question, expressly concerned itself only with the need of subcontractors for a date certain, I do not believe that Congress intended the benefits of this certainty to be one-sided. In my view, given the general purpose of the limitations provision and Congress' concern with the problem of certainty, the Miller Act limitations provision should be interpreted so as to maximize the ability of debtors and sureties to unambiguously determine the commencement of the limitations period.

Of the competing interpretations of the statutory language, the one more calculated to enhance this certainty is that of the defendants. The date of original completion of scheduled contract work is something relatively easy to ascertain; on the other hand, whether a need for repairs will arise sometime in the future is a matter wholly incapable of ascertainment at a time when debtor and surety are most in need of knowing how to allocate encumbered assets and resources. Accordingly, I am inclined to agree with the defendants that the prevailing case law—which is bottomed on the kinds of certainty considerations discussed here—should be adhered to. Plaintiff may, therefore, not rely on the type of work done by Del-Grass on October 6, 1972 as tolling the limitations statute.[19]

## II. WORK PERFORMED BY SWEENEY ITSELF.

The issue has been raised that plaintiff itself may have performed some work serving to timely toll the limitations statute.[20] The only work cited in plaintiff's brief, however, was work done on October 6th,[21] and plaintiff has, both in its brief and at oral argument conceded that the nature of the work, if any, done by plaintiff on October 6th was the supervision of Del-Grass.[22] Since I have already ruled that the

---

17. *Johnson Service Company v. Transamerica Insurance Company*, 485 F.2d 164, 173 (5th Cir. 1973).

18. *Cf. Johnson Service Company*, immediately *supra*.

19. In a case cited by the plaintiffs, *Trinity Universal Insurance Co. v. Girdner*, 379 F.2d 317 (1967), the Fifth Circuit apparently departed from the type of certainty-oriented course espoused here. Although the case was later virtually repudiated, see *General Ins. Co. v. Audley Moore & Son*, 409 F.2d 1326 (5th Cir. 1969), it has resurfaced on a number of occasions and has resulted in the Fifth Circuit's currently stating that "each case must be judged on its own facts. . . ." *Johnson Service Co. v. Transamerica Ins. Co., supra*, 485 F.2d at 173. In my view, such case-to-case uncertainty is something Congress wanted to avoid.

20. Defendants' Opening Brief, Doc. No. 33, pp. 42, *et seq.*

21. At one point, it appeared that plaintiff might rely on work performed on some other dates, but the deposition testimony of plaintiff's superintendent revealed only that he had visited the Dover AFB job site on November 20, 1972 to "check for erosion" after a heavy rainfall. Such a mere check-up does not amount to the "performing of labor" in the sense envisioned by 40 U.S.C. § 270b(b). *Cf. General Ins. Co. v. Audley Moore & Son*, 406 F.2d 442 (5th Cir. 1969) (inspections and measurements made on job site for the purpose of preparing final estimate held not to toll the limitations statute).

22. See also, Dep. of William Massey, Doc. No. 31, at pp. 6–7. Implicit in my citation of Mr. Massey's deposition, of course, is a denial of defendants' motion to strike that testimony,

work of Del-Grass cannot be relied on, it follows that defendants' motion should be granted.

Submit order.

Doc. No. 34. True, defendants were not prepared to cross-examine Mr. Massey at the time of his deposition, this put then in no worse position than an affidavit, however, and, given the summary judgment posture here, I find no prejudice to the defendants.